### 14269

### KAY v. BALENTINE PACKING CO.

(184 S. E., 846)

*Messrs. Nettles & Poteat* and *D. B. Leatherwood,* for appellant,

486

*Messrs. J. Robert Martin* and *J. Robert Martin, Jr.,* for respondent,

April 3, 1936.

The opinion of the Court was delivered by Mr. Justice Baker.

This is an action under Lord Campbell's Act brought in the Court of Common Pleas for Greenville County by the administrator of the estate of W. F. Kay, deceased, for the alleged wrongful death of the said W. F. Kay, resulting in a verdict for respondent in the sum of $3,000.00.

Paragraphs 4 and 5 of respondent's complaint are as follows:

"(4) That on the 5th day of October, 1933, and for some time prior thereto, plaintiff's deceased was employed by the defendant, Balentine Packing Company in the capacity of a butcher in its cutting room situated on second floor of its plant; that for the convenience of its employees and for cleanliness of defendant, the defendant maintained a dressing room on the third floor of said plant where plaintiff and

other employees changed from street clothes to uniform dress, required by the rules of the defendant company. That early on the morning of October 5th, 1933, plaintiff's deceased went to said dressing room situated on third floor of plant, changed his clothes preparatory to commencing day's work; that a part of the equipment furnished plaintiff's deceased to carry on work required of him was what is commonly known as a 'push cart' used to assort into and transfer meats from place to place about the plant; that at said time plaintiff's deceased undertook to convey one of said 'push carts' from third floor of defendant's manufacturing plant to the second floor thereof by means of freight elevator, the defendant furnishing no regular operator for same, but allowing and requiring any and all of its employees to operate and use said freight elevator in the carrying on and conducting of its business, the shaft and elevator not being equipped with automatic safety doors and appliances for the protection of plaintiff's deceased and other employees in the use of the same; and when plaintiff's deceased had placed and stationed said elevator at third floor for reception of 'push cart' as aforesaid, using the means provided by the defendant for such, turned thereto with 'push cart' said elevator, without notice and knowledge of plaintiff, was moved and caused to be moved from where plaintiff's deceased had placed it at third floor of said manufacturing plant to the top of the elevator shaft, same being caused by reason of lock on elevator being insecure, rusty, defective, and worn, said lock failing to securely hold elevator as plaintiff had placed it, so that when plaintiff's deceased pushed cart on to elevator entrance of third floor, being unable to see on account of the absence of light thereat, there was instead of elevator platform and carriage an open elevator shaft, causing plaintiff's deceased to be jerked, overbalanced, and thrown along with 'push cart' into the pit thereof some forty or fifty feet below, cutting, crushing, bruising and mangling plaintiff's deceased's body, limbs, and head, so that he died thereof.

"(5) That the death of plaintiff's deceased resulted from and was caused by the negligent and reckless acts of the defendant, Balentine Packing Company, its agents and servants, in failing to furnish plaintiff a safe place to carry on the work required of him; in failing to furnish plaintiff with safe means and instrumentalities with which to carry on the work required of him; in failing to inspect and keep in repair the means and instrumentalities with which plaintiff was required to carry on his work; in failing to furnish plaintiff's deceased and servants thereat engaged proper system, rules, and regulations in the use of said elevator; in maintaining said elevator without automatic safety devices, lights, and safeguards to protect plaintiff's deceased and other servants required to use the same; and in failing to furnish operator for running of said elevator and in allowing an indiscriminate use of it by any servant without notice or warning to other employees."

The answer of appellant, for a first defense, was a general denial; for a second defense, contributory negligence and recklessness; and, for a third defense, assumption of risk.

At the conclusion of respondent's testimony, appellant moved for a nonsuit on the ground that it had not been made to appear that any act or omission on the part of the appellant was a proximate cause of the death of plaintiff's deceased; that there was no actionable negligence shown. This motion was refused, and appellant proceeded with its testimony. When all testimony was in, a motion was then made for a directed verdict on the same ground of the motion for nonsuit, and refused.

The appeal is based upon two exceptions, in refusing to order a nonsuit and direct a verdict: (1) "It has not been made to appear that any act or omission on the part of the defendant was a proximate cause of the death of plaintiff's intestate; and (2) there is no actionable negligence on the part of defendant shown." It is, therefore, necessary to

briefly set forth the pertinent testimony as gleaned from a voluminous record.

Respondent's intestate was 62 years of age, was a meat cutter, and was and had been employed by appellant in this capacity for a number of years at its plant in Greenville, S. C. His hour for beginning work in the mornings was 6:30, but he was accustomed to reaching the plant at about 6 o'clock for the purpose of changing from his clothes to uniform, and procuring and carrying to the cutter's room carts or trucks on which the meat was placed after cutting to be transferred by helpers to various parts of appellant's plant. These carts or trucks, sometimes called "push carts" were propelled by some person pushing or pulling them. The plant of appellant had a basement, three floors, and a loft. The cutting room is on the second floor, and the dressing room, also used for temporary storage of lard buckets and other supplies, was just above the cutting room, or on the third floor. There is a freight elevator shaft opening into both the cutting room and dressing room, and the elevator is operated by means of a control cable which runs through an opening on the side of the elevator carriage and is connected with an electric motor at the top of the shaft. The elevator is brought to a stop at the desired floor by one of two methods: If the operator is riding in the elevator, he sets a lock which is attached to the side of the elevator through which the control cable passes, so that when a ball on the control cable is reached at the desired floor the motor is turned off and the carriage is brought to a stop. If the operator is not riding on the elevator but is standing outside the shaft, and desires to bring the elevator up or down to the floor landing where he stands, he can do so by simply pulling the control cable, thus starting the motor, and when the elevator reaches his floor, stop the motor by pulling the cable in the opposite direction. In order for such an operator to stop the elevator car by means of the lock on the control cable, he must wait until the car has almost reached his floor, lean over, and snap the lock on the side of the car, so that

when the ball on the cable at his floor level is reached the elevator is stopped. There is no way by which an operator who is not in the car itself can bring the elevator to a stop automatically. He must stand at the shaft opening, wait until the elevator reaches his landing, and then stop it by either pulling the cable by hand, or reaching inside the car and setting the cable lock. If he starts the elevator either up or down and leaves it unattended, the car will continue to the top or bottom of the shaft, where it is automatically brought to a stop.

It was Mr. Kay's custom every morning before the actual work began to gather up the necessary two-wheeled carts and take them in the elevator to the cutting room on the second floor, where they would be ready to receive the cuts of meat as they were prepared.

On the morning of October 5, 1933, in accordance with his custom, respondent's decedent reached the plant of appellant at about 6 o'clock and entered it with the foreman of his department, a Mr. Mitchell. They proceeded to the third floor where the foreman unlocked the dressing rooms, and deceased immediately changed his clothes, and on his way out met the foreman and inquired as to the number of hogs that would be slaughtered. Upon being informed there would be a hundred, deceased opened the gate to the elevator shaft, pulled the elevator control cable, and said he would get the trucks. Mitchell, the foreman, told deceased there were two trucks just around the door, and when deceased started the elevator upward, it then being at the second floor, he turned and had walked about two steps in the direction of the trucks when Mitchell last saw him prior to his injury, from which he died. Another witness, by the name of Kendel, testified that he walked up to the third floor on the morning in question, heard the elevator running, and saw deceased at the elevator shaft facing it with the gate open, at which time there were no carts or trucks at or near the elevator gate or door. The witness Kendel was, according to the testimony, the last person who saw deceased prior to his fall.

Deceased was found at the bottom of the elevator shaft in a semiconscious condition; also a broken cart or truck. The elevator was in the loft where it would automatically stop if traveling upward.

There was testimony that the switch or lock on the elevator was in bad order due probably to a corroded condition, and would fail to work on occasions, and had been in this condition for days; and that following the accident it had been repaired. (Of course the testimony as to repairs to the switch was admissible only for the purpose of showing the changed conditions as existing at the plant with reference to the elevator, and cannot be taken as evidence of negligence.) There was also testimony to the effect that the lighting system on the third floor was extremely poor, and entirely inadequate to allow one to determine, except upon close scrutiny, if the elevator was stopped or standing at this third floor, especially if the lights were obscured to any extent by boxes of supplies, etc., sometimes stored on this floor, and there was testimony that on the morning in question there were stored boxes and cans of lard. There was testimony that following the accident, more adequate light was furnished; but this, as the repair of the switch, cannot be taken as evidence of negligence, but was admissible to show the changed condition.

No one knows how the accident occurred and while deceased was being carried to the hospital in an ambulance, he was asked how it came about, and in reply, shook his head, and said "I don't know."

The question this Court is called upon to decide is whether there was any testimony of actionable negligence as a proximate cause of the injury and death of plaintiff's intestate.

There was testimony from which the jury might reasonably conclude that Kay remained at the shaft until the elevator car came within his reach, and they might reasonably infer from the facts and circumstances as to which there was testimony that he pulled the switch or lock to stop the elevator at the third floor before going for

the carts; or that he stopped the elevator at the third floor by using the cable. There was, however, no testimony or facts and circumstances indicating what caused or who was responsible for the elevator being moved from that floor, if it was moved, between the time it may have been stopped there by Kay and his return with the car. Who or what is responsible for the elevator not being there when he returned is, therefore, a matter of pure speculation and conjecture, and plaintiff's testimony fails to establish any negligence in that respect. There was, however, testimony to the effect that there was no light in or on the elevator, and that the floor and surroundings were insufficiently lighted. This testimony was sufficient to require the matter to be submitted to the jury to determine whether or not the appellant was negligent in failing to furnish a safe place to work, and whether such negligence, if found to exist, was a proximate cause of the accident.

It is unnecessary to discuss the several cases cited by the appellant to the effect that the mere fact of injury does not show negligence. This is a well-recognized principle, but is not applicable for the reasons aforementioned.

There are cases cited in the appellant's brief to the effect that an employee assumes the risks incident to all dangers and defects which to a person of his experience and understanding are or ought to be patent and obvious; but neither the question of assumption of risk nor contributory negligence is before this Court. The motion for nonsuit and for directed verdict was solely upon the ground that there was no evidence of actionable negligence, and the exceptions raise only this question.

Judgment affirmed.

Mr. Chief Justice Stabler and Messrs. Justices Carter, Bonham and Fishburne concur.